**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| _____ x | | |
| MICHAEL RUTTENBERG, Individually and on Behalf of All Others Similarly Situated, | : | Case No. |
| | : | |
| Plaintiff, | : | CLASS ACTION |
| | : | |
| | : | |
| vs. | : | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | : | |
| SERVICEMASTER GLOBAL HOLDINGS, INC., NIKHIL M. VARTY, and ANTHONY D. DILUCENTE | : | |
| | : | |
| | : | DEMAND FOR JURY TRIAL |
| Defendants. | : | |
| | : | |
| _____ x | | |

**INTRODUCTION**

Plaintiff Michael Ruttenberg ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Common stock and Exchange Commission ("SEC") filings by ServiceMaster Global Holdings, Inc. ("ServiceMaster" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**SUMMARY OF THE ACTION**

1.      This is a securities class action brought on behalf of all persons or entities who purchased or otherwise acquired the publicly traded common stock of ServiceMaster between February 26, 2019 and November 4, 2019, both dates inclusive (the "Class Period"). The action is brought against ServiceMaster and certain of its officers and/or directors (collectively, "Defendants") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.      ServiceMaster is a leading provider of essential services to residential and commercial customers in the termite, pest control, cleaning and restoration markets. ServiceMaster's largest and most profitable business segment is Terminix, a termite and pest control business that primarily operates in the United States. Among other services, Terminix offers an annual coverage plan for its termite customers, which indemnifies the customer against the cost of treatments and repairs.

3.     Relatedly, beginning in the last century, the Formosan termite ("Formosan") was introduced to the United States.  Since then, the Formosan has been widely regarded as the most invasive species of termite in America, capable of widespread property damage to homes and other structures in a short period of time.  Formosan activity is generally relegated to the Gulf Coast region of America, specifically including Alabama.  According to ServiceMaster, Mobile, Alabama, is considered the most at-risk community for Formosan infestation.

4.     Due to the importance of Terminix to ServiceMaster's financial results, ServiceMaster previously underwent a turnover of key management following slowing growth in the Terminix segment in 2017.  The new management, Defendants Nikhil M. Varty ("Varty"), ServiceMaster's Chief Executive Officer ("CEO") at all relevant times, and Anthony D. DiLucente ("DiLucente"), ServiceMaster's Chief Financial Officer ("CFO") at all relevant times, were tasked with revitalizing growth in the Terminix segment with a focus on customer service and operations.

5.     During the Class Period, Defendants Varty and DiLucente repeatedly assured the market that ServiceMaster was successfully executing upon the Company's transformation plan for the Terminix segment.  In addition, Defendants Varty and DiLucente stated that Terminix would reach a positive "inflection point" and was "definitely the driver" for positive trends expected in the second half of 2019.  Unbeknownst to investors, however, over the past several years the Terminix segment had experienced an adverse trend of costly termite litigation, primarily related to Formosan activity in Mobile, Alabama.  This negative trend, which would ultimately impact ServiceMaster's current and future financial results, was known to Defendants throughout the Class Period, as by their own later admission they had been taking mitigating measures since early 2018.

6.      Therefore, throughout the Class Period, Defendants made materially false and/or misleading statements and omissions.  Specifically, Defendants failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by Defendants:

(a)      ServiceMaster had failed to properly inspect and treat for Formosan activity;

(b)      as a result thereof, the Company was and continued to experience a material adverse trend of costly litigation from injured customers which was not disclosed to investors;

(c)      in an unsuccessful attempt to mitigate this trend, Defendants had been taking remedial measures since at least 2018, including drastically raising prices for termite treatments in Mobile, Alabama to deter contract renewals; and

(d)      as a result of the foregoing, ServiceMaster's financial results were reasonably likely to be impacted, and would continue to impact the Company into 2020.

7.      On October 22, 2019, before the markets opened, ServiceMaster announced disappointing preliminary financial results for the third quarter 2019, having missed revenue and earnings estimates.  Additionally, ServiceMaster reported net income of $25 million versus $71 million during the third quarter of the prior year.  The Company also gave downward adjusted EBITDA guidance of $415 to $425 million, down from $435 to $445 million.  Finally, the Company announced the sudden departure of Matthew J. Stevenson in his role as President of Terminix Residential, effective October 31, 2019.

8.      The press release attributed the disappointing results to "termite damage claims arising primarily from Formosan termite activity," primarily in Mobile, Alabama.  The

Company further stated that this had been a ***known issue***, having taken mitigating measures since ***early 2018.***  Finally, while the press release indicated that the Company's organic revenue growth would offset "***a reduction in termite renewals driven partially by managed reductions from price increases in the Formosan termite market of Mobile, Alabama***"—contradicting previous statements that the price increases were optional.[1]

9.      On this news the price of ServiceMaster common stock ***fell $11.44 or 20 percent***, closing at $44.70 on October 22, 2019, down from its $56.14 closing price on October 21, 2019.

10.      On November 5, 2019, before the start of trading, ServiceMaster released its third quarter 2019 financial results.  In this press release discussing the "challenging quarter," the Company revealed that it had been impacted by certain "legacy risks," including "termite damage claims."

11.      That same day, Defendants held an earnings call with analysts and investors to discuss ServiceMaster's third quarter 2019 financial results. On the call, Defendant Varty informed the market that the increase in termite litigation—which occurred "***[i]n the past few years***"—had impacted termite revenue by 7 to 8 percent, up from the historic impact of termite damage claims of 4 to 4.5 percent.  Defendant Varty also stated that the impact of the increased claims would continue to impact the Company throughout 2020, and also disclosed that the price increases in Mobile, Alabama were part of an initiative to "mitigate" termite damage claims.  Finally, Defendant DiLucente stated that in addition to the "$2 million increase damage claims expense due to the increase in Formosan termite activity in the Mobile, Alabama area,"

---

[1] Emphasis added throughout, unless otherwise noted.

that the Company "*expect[ed] a year-over-year increase from damage claims of approximately $4 million in the fourth quarter*."

12.     On this news, the price of ServiceMaster common stock fell $1.42, or 3.5 percent to close at $39.15 on November 5, 2019.  As the market continued to digest the disappointing news, ServiceMaster shares continued to decline by $3.41, or 9 percent, closing at $35.74 on November 6, 2019.  All told, following the November 5, 2019 disclosure, ServiceMaster stock suffered a total decline of $4.83 from the November 4, 2019 closing price.

13.     As a result of Defendants false and/or misleading statements and/or omissions, Plaintiff and the Class have suffered harm under the federal securities laws.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) as a significant portion of Defendants' actions, and the subsequent damages, took place within this District.  In addition, ServiceMaster trades on the New York Stock Exchange ("NYSE").

17.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national common stock markets.

## PARTIES

18.     Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased the common stock of ServiceMaster during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

19.     Defendant ServiceMaster is a Delaware corporation. The Company's stock is listed on the NYSE under the ticker symbol "SERV."  As of February 24, 2020, ServiceMaster had 135,444,913 shares of outstanding common stock.

20.     Defendant Varty was, at all relevant times, the CEO of ServiceMaster.

21.     Defendant DiLucente was, at all relevant times, ServiceMaster's Senior Vice President and CFO.

22.     Defendants Varty and DiLucente are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of ServiceMaster's reports to the SEC, press releases, and presentations to common stock analysts, money portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

6

23.    ServiceMaster and the Individual Defendants are referred to herein, collectively, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Company Information

24.    ServiceMaster is a leading provider of essential services to residential and commercial customers in the termite, pest control, cleaning and restoration markets, operating through an extensive service network of more than 8,000 company‑owned locations and franchise and license agreements.  The Company held its initial public offering in June 2014 after which its shares began trading on the NYSE under the ticker symbol "SERV."

25.    The Company's portfolio of brands includes AmeriSpec (home inspections), Copesan (commercial national accounts pest management), Furniture Medic (cabinet and furniture repair), Merry Maids (residential cleaning), Nomor (European pest control), ServiceMaster Clean (commercial cleaning), ServiceMaster Restore (restoration), Terminix (residential termite and pest control) and Terminix Commercial (commercial termite and pest control).

26.    Terminix is ServiceMaster's largest and most profitable business segment.  In 2018, Terminix accounted for approximately 87 percent of the Company's revenue.  Also in 2018, Terminix accounted for 79 percent of the Company's adjusted EBITDA.  In addition, 80 percent of Terminix's revenue in 2018 was generated from the annual renewal of customer contracts.  Therefore, the retention of Terminix customers is critical to ServiceMaster's financial health.

27.    As part of its efforts to attract and retain customers seeking  long-term subterranean termite solutions, Terminix offers an annual coverage plan for its customers.  To

enter into such plans, Terminix purportedly offers a complimentary initial inspection to assess whether the property has an existing infestation to determine customer eligibility.  Then, upon entering into the contract, Terminix allegedly provides another inspection annually, and will provide further inspections on an as-needed basis.  Should termites be discovered at any time, Terminix will eliminate the infestation at no cost, additionally covering the costs of further treatments and well as damages and repairs.

28.     Due to the importance of Terminix to ServiceMaster's financial results, ServiceMaster previously underwent a turnover of key management following slowing growth in the Terminix segment in 2017.  The new management, Defendants Varty and DiLucente, were tasked with revitalizing growth in the ailing segment with a focus on customer service and operations.

29.     On January 18, 2017, it was reported that Defendant DiLucente would replace Alan Haughie as Senior Vice President and CFO of ServiceMaster.  Alan Haughie had served in the role since 2013.  Defendant DiLucente officially assumed the role in February 2017, following the release of ServiceMaster's full year 2016 financial results.

30.     Several months later on July 27, 2017, Defendant Varty became CEO of ServiceMaster, replacing Rob Gillette, who had served as ServiceMaster's CEO since 2013.  On July 31, 2017, Varty participated in his first Company earnings call with analysts and investors. On the call, Varty touted his "extensive experience leading large organizations and driving revenue and growth profitability including some service businesses."  Further, Varty stated that it was "clear to [him]" that there was "significant opportunity to unlock value at ServiceMaster by sharpening [their] focus on results on operational excellence."

## Background on Formosan Termite Activity in the Gulf Coast

31.     During or around the 1950s, Formosans, commonly referred to as the "super termite," were first introduced to the United States.  Since then, Formosans have been considered the most aggressive and economically devastating species of termite in the United States, causing approximately a billion dollars a year in property damage.  Like other subterranean termites, Formosans feed on materials that contain cellulose, but because of their larger colony size, they attack a greater variety of wood at a faster rate than subterranean termites native to the United States.  They have an enormous reproductive capacity and a typical colony may easily exceed 1 million insects.

32.     In the United States, Formosans exist in warm, humid climates, and are commonly found in Gulf Coast states, such as Alabama, Florida, Georgia, Louisiana, Mississippi, and Texas.  They have also been found in North Carolina, South Carolina, Hawaii, and California.  In 2017, Terminix reported that Mobile, Alabama, suffered the highest level of Formosan infestation.[2]

33.     Similar to all subterranean termites, Formosans construct shelter tubes out of mud to travel from their underground nest to a food source.  Formosans also uniquely construct above ground nests within the structures that they infest.  In the context of a structural infestation, these nests are typically found within walls, and are referred to as "cartons" in the pest control industry.  The possibility of both a Formosan nest close to a structure and an above ground nest within the structure can greatly increase the damage potential of these termites.  Accordingly, it is integral to closely monitor and promptly treat any sign of Formosan activity.

---

[2] *See Termites Take Biggest Bite Out of Cities in Alabama, Florida and Texas*, TERMINIX (Mar. 20, 2017), https://www.globenewswire.com/news-release/2017/03/20/1337912/0/en/Termites-Take-Biggest-Bite-Out-of-Cities-in-Alabama-Florida-and-Texas.html.

Property owners, in at-risk areas therefore heavily rely on Terminix's annual protection contracts to safeguard against catastrophic damage from Formosan invasion.

34.     Relatedly, on February 19, 2019, local Alabama news source *WPMI-TV*, reported that Terminix customers in Mobile, Alabama were shocked to discover their contract renewal rates had sharply increased by nearly 400 percent.[3]   According to Terminix's response, however, the rate increases were purportedly "option[al]," and instead represented a new, more "comprehensive" termite prevention service which customers could "switch" to:

> With aggressive Formosan termite activity in this region at an all-time high, Terminix is introducing a new termite control service to give our customers the most comprehensive protection available. ***Many of our customers in the region are being given the option to switch to this more comprehensive service which combines our two strongest termite treatments***. It is indeed a more expensive service, and we realize our customers will need time to make this decision.

### Materially False and Misleading Statements Issued During the Class Period

35.     The Class Period begins on February 26, 2019, when ServiceMaster reported its financial results for the fourth quarter of 2018.  In the press release, Defendants provided full year 2019 revenue guidance of $2.020 billion to $2.050 billion, or an increase of 6 to 8 percent compared to 2018, as well as Adjusted EBIDTA guidance of $435 to $445 million.  The Company also projected organic revenue growth at Terminix in the range of 2 to 3 percent. Defendant Varty was quoted in the press release touting that the Company was successfully executing on its transformation plan, specifically referring to Terminix, stating in pertinent part:

> "Our primary goal in 2018 was to transform our Terminix business and ***unlock the potential to drive sustainable revenue growth***. We are pleased to report that our focused efforts throughout 2018 and strategic initiatives resulted in record revenue at Terminix in the fourth quarter and full year 2018," said

---

[3] Andrea Ramey, *Terminix Customers Who See Drastic Rate Increases Should Report to State*, NBC 15 (Feb. 19, 2019), https://mynbc15.com/news/local/terminix-customers-who-see-drastic-rate-increases-should-report-to-state.

ServiceMaster Chief Executive Officer Nik Varty. "*Improvements in pest sales, driven by enhanced marketing initiatives, and stronger start and completion rates drove organic growth of 5 percent during the quarter, including over 7 percent in residential pest for a second consecutive quarter*."

36. Additionally on February 26, 2019, Defendants held a conference call with analysts and investors to discuss ServiceMaster's fourth quarter 2018 financial results. On the call, Defendant DiLucente stated that among the "other cost drivers in the quarter" was a "*$2 million of damage claims expense increase, predominantly related to activity in a section of the Gulf Coast*."

37. Also on the earnings call, Defendant Varty touted that the Terminix transformation plan was being executed successfully towards a "long-term sustainable business model," stating in pertinent part:

> We made tremendous progress on the core business in 2018, while taking on an increased workload to deliver on the spin because of major commitment to our shareholders. Revenue growth at Terminix is at levels we haven't seen in over a decade, and new unit sales are at an all-time high. With 5% organic growth in the quarter, we are approaching industry-level growth rates and have direct line of sight to 30% incremental margins. *We are focused on improving profitability in the Terminix business, but we are approaching the next steps in a strategic disciplined manner. We have gone through a period of time in our company history where the emphasis was on short-term cost cutting and it led to sharp declines in customer service levels, and ultimately, a declining growth rate. We are taking the necessary steps to create a long-term sustainable business model that will convert consistent growth*, both organically and through acquisitions, to the bottom line. By focusing on our mission of creating cleaner, healthier, safer environments for our customers at home, work and play, we can deliver on our future commitments just as we have done in 2018, and *I am confident that executing on our strategic goals in 2019 will lead to significant shareholder value*.

38.     On March 1, 2019, ServiceMaster released its 2018 annual report on SEC Form 10-K (the "2018 10-K"). The 2018 10-K disclosed the importance of Terminix customer renewals, and explained the Company's long-term termite service plan as a key to their competitive advantage:

> Approximately 80 percent of Terminix revenue comes from customers who enter into contracts with the option to renew annually. Typically, termite services require an initial inspection and the installation of a protective liquid barrier or bait stations surrounding the home. ***The protection plan contracts provide a guarantee for the repair of new damage resulting from termite infestation. After the first year, a customer has the option to renew the contract at a significantly reduced cost that extends the guarantee***. Consequently, revenue generated from a renewal customer is less then revenue generated from a first-year termite customer.
>
> ***We believe that the strength of the Terminix brand, along with our history of providing a high level of consistent service, allows us to enjoy a competitive advantage in attracting, retaining and growing our customer base***. We believe our investments in systems and processes, such as routing and scheduling optimization, robust reporting capabilities and mobile customer management solutions, enable us to deliver a higher level of customer service when compared to smaller regional and local competitors.
>
> Our focus on attracting and retaining customers begins with our associates in the field, who interact with our customers every day. Our associates bring a strong level of passion and commitment to the Terminix brand, as evidenced by the 9‑year and 8‑year average tenure of our branch managers and technicians, respectively. Our field organization is supported by dedicated customer service and customer care center personnel. ***Our culture of continuous improvement drives an intense focus on the quality of the services delivered, which we believe produces high levels of customer satisfaction and, ultimately, customer retention and referrals***.

39.     The 2018 10-K, in the section titled "Significant Accounting Policies," discussed certain "significant areas requiring the use of management estimates," which included "accruals

for termite damage claims." According to the 2018 10-K, there were "no changes in the

significant areas that require estimates or in the underlying methodologies used in determining

the amounts of these associated estimates" with respect to termite damage claims:

> ***The preparation of the consolidated financial statements requires management to make certain estimates and assumptions required under GAAP which may differ from actual results***. ***The more significant areas requiring the use of management estimates relate to*** revenue recognition; the allowance for uncollectible receivables; accruals for self-insured retention limits related to medical, workers' compensation, auto and general liability insurance claims; ***accruals for termite damage claims***; the possible outcome of outstanding litigation; accruals for income tax liabilities as well as deferred tax accounts; the deferral and amortization of customer acquisition costs; share based compensation; useful lives for depreciation and amortization expense; the valuation of marketable securities, including the valuation of retained shares of Frontdoor common stock; and the valuation of tangible and intangible assets. ***In 2018, there were no changes in the significant areas that require estimates or in the underlying methodologies used in determining the amounts of these associated estimates***, other than the valuation of our retained shares of Frontdoor common stock.

40. The 2018 10-K further explained the Company's procedures for accounting for

termite damage claim accruals, stating in pertinent part:

> Termite damage claim accruals in the Terminix business are recorded based on both the historical rates of claims incurred within a contract year and the cost per claim. Current activity could differ causing a change in estimates. We have certain liabilities with respect to existing or potential claims, lawsuits, and other proceedings. We accrue for these liabilities when it is probable that future costs will be incurred and such costs can be reasonably estimated. Any resulting adjustments, which could be material, are recorded in the period the adjustments are identified.

41. Finally, the 2018 10-K reported an ending litigation reserve balance of $111

million for the quarter ended December 31, 2018, down from the previous quarter's balance of

$112 million.

13

42.     On May 7, 2019, ServiceMaster issued a press release reporting its financial

results for the first quarter 2019, and affirmed its full year 2019 guidance.  Defendant Varty was

quoted in the press release touting that the Company was successfully executing on its

transformation plan, specifically referring to "positive trends" in Terminix, stating in pertinent

part:

> "*Our solid performance in the quarter reflects the consistent
> progress we are making on executing our strategic initiatives*,"
> said ServiceMaster Chief Executive Officer Nik Varty. "In our
> pest control core, organic growth of 3 percent in the quarter
> included 4 percent growth in residential pest and 2 percent in
> termite and home services, despite the impact of unseasonably
> cold weather and flooding on our operations and lead flow.  *We
> see positive trends in commercial pest with customer retention
> reaching three-year highs, driven by continued improvement in
> customer service as we leverage the best practices of Copesan
> and enhance the customer experience we deliver*. ServiceMaster
> Brands grew revenue organically 5 percent in the first quarter.
> Our focus on high-growth market verticals is paying dividends
> with healthcare cleaning and disinfection up 7 percent and
> commercial restoration up 35 percent in the quarter. Strategic
> M&A also continues to be a growth driver, with 11 pest control
> acquisitions in the quarter."

43.     On that same date, Defendants held a conference call with analysts and investors

to discuss ServiceMaster's first quarter 2019 financial results.  On the call, Defendant Varty

reiterated that the Company was successfully executing upon the enhanced customer service

initiatives which were key to ServiceMaster's transformation plan, stating in pertinent part:

> Underlying all of these initiatives is re-imagining the customer
> experience. Excellent customer service, easy to talk about but
> incredibly difficult to consistently deliver. *My job as a leader of
> ServiceMaster is to empower our customer facing employees
> with training, tools and motivation needed to deliver consistently
> excellent customer service at every touch point. We are creating
> a culture obsessed with service delivery. And while that mindset
> will take time to permeate throughout our organization, we are
> already making great strides*.

14

44.     Additionally on the call, Defendant DiLucente touted the growing margin

expectations for the Terminix segment, and projected that "the second half of 2019" would

represent "a positive inflection point" in year-over-year adjusted EBIDTA, stating in pertinent

part:

> Including the additional investments in growth to Terminix, we
> expect incremental margins of the business to contribute
> approximately 30%, excluding a $11 million of dis-synergies and
> $9 million of additional cost related to the Salesforce
> implementation. It's important to note that 30% incremental
> margins are for the full year and we'll increase throughout the
> year as productivity initiatives are realized and retention rates
> continue to improve.
>
> **We expect a positive inflection point in our year-over-year
> adjusted EBITDA margins in the second half of 2019**, as a result
> of revenue conversion more than offsetting dis-synergies and
> investment in growth.

45.     During the question and answer portion of the May 7, 2019 earnings call,

Defendants were questioned as to what was driving Terminix's better pricing, to which

Defendant DiLucente responded that it was due to favorable market conditions:

> **Analyst:** Tony in your prepared remarks, I heard you mention
> termite pricing a couple of times being better. That's consistent
> with some of the survey work that we've done recently on the pest
> control market. ***Can you just talk about what's driving the better
> pricing? Is that just Terminix kind of going out and getting
> what it feels it deserves, where it's been lacking? Or you do you
> feel just like the market is supportive of better pricing?*** Could
> you just sort of frame what's driving the better pricing, because
> that's something that we're definitely seeing in our survey work.
>
> **Defendant DiLucente:** Sure. Thanks, Seth. ***And I think the latter
> explanation you gave is really the best answer the market can
> support a relatively modest price increases year-in and year-out***.
> And we typically have done that historically and look at that this
> year as well. So if you think about the – would be bill out for
> these termite services, the increases per customer relatively small,
> and could be absorbed fairly easily. So pretty typical thing for us.

15

46. Also during the May 7, 2019 earnings call, Defendant Varty was questioned as to whether he was seeing any "new business trends" in "termite control," and if so, "how [they] [were] performing." In response, Defendant Varty touted that ServiceMaster's "renewed efforts" were "starting to pay dividends," and a "positive sign for [the Company's] termite business," stating in pertinent part:

> *I mean what we're seeing right now is based on our new renewed efforts to focus heavier on preventive rather than just curative is starting to pay dividends* with just – an initial rollout of our bundled offerings. So this will take some time to take traction, but already our customers are appreciating in our pilot programs sort of what's happening. *I'm also even more excited for the future where we're driving these clean sheet designs,* and termite was the first program we picked up on where we're completely redefining, how we do business with our customers and completely re-imagining the journey, and touch points that we have. *So I see a lot of good -* and all of this new stuff that we're going to drive is only going to work if our service levels start creeping up. *And seeing the NPS score month after month after month improving and also finally starting to see the cancellations turnaround is a very positive sign for our termite business*.

47. On May 8, 2019, ServiceMaster released its quarterly report for the first quarter 2019 on SEC Form 10-Q (the "Q1 2019 10-Q"). With regards to termite damage claims accruals, the Q1 2019 10-Q stated that:

> Termite damage claim accruals in the Terminix business are recorded based on both the historical rates of claims incurred within a contract year and the cost per claim. Current activity could differ causing a change in estimates.

> We have certain liabilities with respect to existing or potential claims, lawsuits and other proceedings. We accrue for these liabilities when it is probable that future costs will be incurred and such costs can be reasonably estimated. Any resulting adjustments, which could be material, are recorded in the period the adjustments are identified.

48.     The Q1 2019 10-Q also reported an ending litigation reserve balance of $113 million for the quarter ended March 31, 2019, up less than two percent from the previous quarter's balance of $111 million.

49.     On August 6, 2019, ServiceMaster issued a press release reporting its financial results for the second quarter 2019, raised its full year revenue guidance to between $2,045 and $2,060 million, and affirmed its full year 2019 Adjusted EBIDTA guidance.  In the press release, Defendant Varty was quoted touting improvements at Terminix, stating in pertinent part:

> ***Our relentless efforts on improving customer service and focus on employee performance capabilities enabled us to deliver strong organic revenue growth at Terminix,*** including the best organic growth we have seen in more than three years in our commercial pest service line. Improvements in customer retention and price realization drove growth across revenue channels, which more than offset the impact of unseasonable weather conditions.

50.     Also on August 6, 2019, Defendants held a conference call with analysts and investors to discuss ServiceMaster's second quarter 2019 financial results.  On the call, Defendant Varty praised Terminix for being able to offset weather related issues which had arisen that quarter, specifically naming the President of Terminix Residential, Matthew J. Stevenson, stating in pertinent part:

> I will start with the Q2 financial highlights on Slide 4. ServiceMaster delivered strong revenue growth in the second quarter as we continue progress on all of our strategic initiatives. We reported 8% revenue growth in the quarter, including 10% growth at Terminix and 2% growth at ServiceMaster Brands. Organic growth at Terminix was 4%, including 6% in Residential Pest, 4% in Termite & Home Services and 2% in Commercial Pest. ***Meaningful retention gains and pricing realizations across all service lines helped to offset lower new unit sales due to the unseasonal weather patterns in the quarter. I am very proud of the growth Matt Stevenson and our team delivered in face of a***

> *challenging environment this quarter, driving several measures anticipating and countering the impacts of weather.*

51.     Additionally, Defendant Varty touted that the Terminix transformation plan was being executed successfully with a  focus on customer service, stating in pertinent part:

> *Our focus on customer service is continuing to strengthen our core*, and Slide 6 provides an example of progress we are making across our businesses. Residential. *Starting in Terminix Residential, our focus on the fundamentals is resulting in a measurable, better customer experience built on significant improvements in the basic blocking and tackling of our route-based business*. For example, missed appointments were down over 50% in the quarter versus prior year. We are also making progress against our goal of speaking with customers before and after every service visit, allowing us to clearly explain the value of our services and set expectations for upcoming visits. We are also making meaningful improvement in the most important aspect of our business, our safety culture, with preventable accidents and injuries down 15% in the quarter. Returning our teammates home safely is our top priority every day. We have been able to make these strides while also improving labor productivity by $2 million year-over-year to enhance overtime management and a targeted initiative to move many hourly technicians to a production-based pay plan.
>
> These initiatives helped drive a 4% reduction in Q2 year-over-year cancel rates in termite and residential pest control. We're also encouraged to see external confirmation of improving customer satisfaction through positive independent survey results over the last few months, one of which recently reported 91% customer satisfaction rate for Terminix, highest in the industry. While that kind of feedback is gratifying, we're not letting up. *We know there is still considerable work ahead of us as we challenge ourselves against strong prior year growth numbers in the back half of this year*.

52.     In discussing Terminix's incremental margins on the August 6, 2019 call, Defendant DiLucente reported a figure of 5 percent, notwithstanding an increase in termite damage claims in the Gulf Coast, stating in pertinent part:

> There was $2 million in increased damage claims expense primarily due to activity in the Gulf Coast region. We also had $4

million in dis-synergies in the quarter. Excluding the impact of $6 million of dis-synergies and SalesForce's investments in the quarter, the incremental margins for Terminix were approximately 5%.

Defendant DiLucente additionally stated that the Company had "increased the bottom end of [its] free cash flow guidance and now expect[ed] to convert adjusted EBITDA to free cash between 55% and 60%."

53.     Finally, when questioned by analysts regarding year-over-year trends by segment, Defendant Varty described Terminix as "definitely the driver" for positive margin trends in the "second half of the year," stating in pertinent part:

> Yes. **We definitely have more margin improvement in the second half of the year in Terminix**. I don't think there's a meaningful change in ServiceMaster Brands. **And so that's -- so Terminix is definitely the driver**. And we have really consistently said that all along that we were going to see lower incremental margins in the first 2 quarters and we're going to slow -- trend up particularly in the third and fourth quarter. So that's the main driver for that trend in the second half.

54.     Additionally on August 6, 2019, ServiceMaster released its quarterly report for the second quarter 2019 on SEC Form 10-Q (the "Q2 2019 10-Q").  The Q2 2019 10-Q contained the same language concerning the accounting practices for termite damage claim accruals as contained in the Q1 2019 10-Q:

> Termite damage claim accruals in the Terminix business are recorded based on both the historical rates of claims incurred within a contract year and the cost per claim. Current activity could differ causing a change in estimates.

> We have certain liabilities with respect to existing or potential claims, lawsuits and other proceedings. We accrue for these liabilities when it is probable that future costs will be incurred and such costs can be reasonably estimated. Any resulting adjustments, which could be material, are recorded in the period the adjustments are identified.

19

55.     In addition, the Q2 2019 10-Q indicated that an increase in termite damage claims "was driven by increased termite warranty claims, primarily in the Gulf Coast region."

56.     The Q2 2019 10-Q also reported an ending litigation reserve balance of $115 million for the quarter ended June, 2019, up less than two percent from the previous quarter's balance of $113 million.

57.     On August 7, 2019, local Alabama news source *WPMI-TV* reported that State regulators had launched an investigation into consumer complaints against Terminix regarding a massive increase in service costs.[4]  Specifically, the news source stated that customers had shown examples of bills increasing from $320 to $1499, or nearly 400 percent.  The report noted that in 2018, regulators had investigated 125 customer complaints, but in 2019 to date, the State was in the process of investigating ***416***.  While it was unclear whether ***all*** of these complaints were against Terminix, regulators commented: "We have been handling numerous calls and complaints relating to Terminix's notice to their existing termite customers regarding the increase in the cost."

58.     Throughout the Class Period, Defendants made materially false and/or misleading statements and omissions.  Specifically, Defendants failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by Defendants:

(a)     ServiceMaster had failed to properly inspect and treat for Formosan termite activity;

---

[4] *See* Andrea Ramey, *State Regulators Investigating Consumer Complaints Against Teminix*, NBC 15 (Aug. 7, 2019), https://mynbc15.com/news/local/state-regulators-investigating-consumer-complaints-against-terminix.

(b)      as a result thereof, the Company was and continued to experience a material adverse trend of costly litigation from injured customers which was not disclosed to investors;

(c)      in an unsuccessful attempt to mitigate this trend, Defendants had been taking remedial measures since at least 2018, including drastically raising prices for termite treatments in Mobile, Alabama to deter contract renewals; and

(d)      as a result of the foregoing, ServiceMaster's financial results were reasonably likely to be impacted, and would continue to impact the Company into 2020.

59.      Moreover, under Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"), Defendants Varty and DiLucente were required to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations," in ServiceMaster's reporting with the SEC.  Defendant Varty and DiLucente's failure to disclose adverse material trends in ServiceMaster's quarterly and annual reports violated Item 303, because these undisclosed facts were known to Defendants and would (and did) have an unfavorable impact on the Company's financial results.

60.      Due to Defendants' materially false and/or misleading statements and omissions, ServiceMaster common stock traded at artificially inflated prices throughout the Class Period.

**The Truth Emerges**

61.      On October 22, 2019, before market open, ServiceMaster announced disappointing preliminary financial results for the third quarter 2019.  In addition to missing revenue and earnings estimates for the quarter, ServiceMaster reported net income of $25 million versus $71 million during the third quarter of the prior year.  The Company also gave adjusted EBIDTA guidance of $415 to $425 million, down from $435 to $445 million.  Finally,

the press release announced the sudden departure of Matthew J. Stevenon in his role as

President of Terminix Residential, effective October 31, 2019.

62.     The press release attributed the disappointing results to "termite damage claims

arising primarily from Formosan termite activity," "concentrated in Mobile, Alabama," which

had "been increasing over the last few years."  The Company further stated that these "trends"

had been a *known issue*, and that ServiceMaster had begun taking mitigating measure in ***early

2018.***

> ***The increase in termite damage claims includes the resolution of
> a single $2 million termite damage claim from 2016***. Termite
> damage claims can take years to fully settle, and timing can be
> difficult to forecast. ***Assuming the continuation of recent trends,
> the company expects higher claims costs to continue in the
> short-term due to increased claims activity***. Formosan termite
> activity has been increasing over the last few years, however due
> to a number of climatic and environmental factors it remains
> largely concentrated in the Mobile, Alabama area of the country,
> which represents less than one percent of Terminix revenue.
> ***Starting in 2018, the company initiated mitigating actions to
> limit our future exposure, including third party claims
> management, reinforcement of effective processes, improved
> documentation, and a change in pricing structure***. We have
> undertaken several other operational changes over the last 18
> months and are confident that we can continue to manage the
> impact of termite damage claims within our projected long-term
> 30 percent incremental margins.

63.     The October 22, 2019 press release further indicated that the Company's

downward adjusted EBIDTA guidance was impacted by several factors, including a "***$10

million reduction from the impact of termite damage claims***" and "***$10 million from targeted

revenue reductions principally in the Mobile, Alabama area***." The press release also stated that

Terminix's organic revenue growth would be able to offset "***a reduction in termite renewals

driven partially by managed reductions from price increases in the Formosan termite market

of Mobile, Alabama***"—contradicting previous statements that the price increases were optional.

64.     The Company, up until this point, had never mentioned Formosans, or Mobile, Alabama, in *any* of its quarterly or annual SEC filings throughout the Class Period, or even since Defendants Varty and DiLucente assumed their positions at the Company in mid-2017, despite taking mitigating actions "*[s]tarting in 2018*."

65.     On this news, the price of ServiceMaster common stock *fell $11.44 or 20 percent*, closing at $44.70 on October 22, 2019, down from its $56.14 closing price on October 21, 2019.

66.     On November 5, 2019, before the start of trading, ServiceMaster released its final third quarter 2019 financial results, which mirrored the October 22, 2019 preliminary third quarter 2019 results.  In this press release discussing the "challenging quarter," the Company revealed that it had been impacted by certain "*legacy risks*," including "*termite damage claims*."

67.     Additionally on November 5, 2019, Defendants held an earnings call with analysts and investors to discuss ServiceMaster's third quarter 2019 financial results. On the call, Defendants gave more information concerning the termite damage claims in Alabama. Specifically, Defendant Varty informed the market that the uptick in claims—which occurred "*[i]n the past  few years*"—had increased termite damage claims cost and impacted termite revenue by 7 to 8 percent, up from the historic numbers of 4 to 4.5 percent.  Defendant Varty also stated that the impact of the increased claims would continue to impact the Company throughout 2020.

> The profitability levels of the business have historically included spending approximately 4% to 4.5% of termite revenue annually in the settlement of these termite damage claims nationally. And the base of our business outside of the Mobile, Alabama area continues to operate at these historical levels. Most of these claims are handled directly with the customer and involve

relatively minor repairs, but a few occasionally involved litigation and the payment of damages.

> *In the past few years, we have seen an increase in the number and average cost of termite damage claims in the Mobile, Alabama area related to Formosan termite activity. We also have seen an increase in the number of termite damage claims in that region that involves litigation.*

> *These two trends have increased our termite damage claim costs as a percentage of termite revenue between 7% and 8%. Given the increased volume we have seen, we expect additional cost increases in 2020 before our mitigating actions only take effect, and we begin to gradually return them to historical norms.*

68. Defendant Varty also disclosed that the price increases in Mobile, Alabama were part of an initiative to "mitigate" termite damage claims by "limit[ing] [the Company's] legacy risk exposure." Further Defendant Varty stated that only now was ServiceMaster employing a "quality assurance team" to oversee the inspection and retreatment associated with customer contract renewals.

> *At the beginning of 2019, we began a pricing initiative in the Mobile, Alabama area to better align the cost we change – we charge for termite customers with the actual cost we incur to provide services in the area.* We anticipated some customer reductions as a result of the pricing change, but they have accelerated faster than we originally projected, and as a result are impacting termite renewal revenue and profitability in the short-term. As these customers renew their contracts, we conduct a detailed inspection and when necessary, re-treat their properties.

> *We have added a dedicated quality assurance team that is solely devoted to these inspections and re-treatments. Another key initiative was to increase awareness of these issues in the area and train technicians more effectively on inspection methods to identify and document aspects of Formosan termite activity that are different from subterranean termites.*

> The inspection and documentation process is vital to ensure we set customer expectations regarding property damage, that may predate our treatment and conducive conditions that may limit our treatments' effectiveness. Another action we have taken is to

improve our claims management process through a third-party administrator. This administrator helps us settle any new claims that may arise at a faster pace than our historical norms.

69.     Finally, Defendant DiLucente stated that in addition to the "$2 million increase damage claims expense due to the increase in Formosan termite activity in Mobile, Alabama," that the Company "*expect[ed] a year-over-year increase from damage claims of approximately $4 million in the fourth quarter*."

70.     Defendants Varty and DiLucente had never up until this point discussed Formasans, or Mobile, Alabama, on any earnings call throughout the Class Period, or even since they assumed their positions at the Company in mid-2017, despite this being a known trend for the "*past few years*."

71.     On this news the price of ServiceMaster common stock fell $1.42, or 3.5 percent, to close at $39.15 on November 5, 2019.  As the market continued to digest the disappointing news, ServiceMaster shares continued to decline by $3.41, or 9 percent, closing at $35.74 on November 6, 2019.  All told, following the November 5, 2019 disclosure, ServiceMaster stock suffered a total decline of $4.83 from the November 4, 2019 closing price.

## **Post Class Period Events**

72.     On January 21, 2020, ServiceMaster issued a press release announcing the surprisingly abrupt departure of Defendant Varty as CEO, effective immediately.  The reasoning given for the sudden resignation was that Defendant Varty was leaving "to pursue other opportunities."

## **UNDISCLOSED ADVERSE FACTS**

73.     The market for ServiceMaster common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, ServiceMaster's common stock traded at artificially inflated prices

25

during the Class Period.  Plaintiff and other members of the Class purchased or otherwise

acquired ServiceMaster common stock relying upon the integrity of the market price of the

Company's common stock and market information relating to ServiceMaster, and have been

damaged thereby.

74.     During the Class Period, Defendants materially misled the investing public,

thereby inflating the price of ServiceMaster's common stock, by publicly issuing false and/or

misleading statements and/or omitting material facts necessary to make Defendants' statements,

as set forth herein, not false and/or misleading.  These statements and omissions were materially

false and/or misleading in that they failed to disclose material adverse information and/or

misrepresented the truth about ServiceMaster's business, operations, and prospects as alleged

herein.

75.     At all relevant times, the material misrepresentations and omissions

particularized in this Complaint directly or proximately caused, or were a substantial

contributing cause, of the damages sustained by Plaintiff and other members of the Class.  As

described herein, during the Class Period, Defendants made, or caused to be made a series of

materially false and/or misleading statements about ServiceMaster's financial well-being and

prospects.  These material misstatements and/or omissions had the cause and effect of creating

in the market an unrealistically positive assessment of the Company and its financial well-being

and prospects, thus causing the Company's common stock to be overvalued and artificially

inflated at all relevant times.  Defendants' materially false and/or misleading statements during

the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's

common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

76.    During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

77.    The Individual Defendants permitted ServiceMaster to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's stock.

78.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding ServiceMaster, their control over, receipt, and/or modification of ServiceMaster's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning ServiceMaster, participated in the fraudulent scheme alleged herein.

79.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of ServiceMaster common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding ServiceMaster's business, operations, and management and the intrinsic value of ServiceMaster common stock and caused Plaintiff and members of the Class to purchase ServiceMaster common stock at artificially inflated prices.

## LOSS CAUSATION/ECONOMIC LOSS

80.    During the Class Period, as detailed herein, ServiceMaster and Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of ServiceMaster common stock, and operated as a fraud or deceit on Class Period purchasers of ServiceMaster common stock by misrepresenting the value and prospects for the Company's business, growth prospects, and accounting compliance.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of ServiceMaster common stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of ServiceMaster common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

81.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiff and other members of the Class purchased ServiceMaster common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

28

82.     At all relevant times, the markets for ServiceMaster common stock were efficient for the following reasons, among others:

(a)     as a regulated issuer, ServiceMaster filed periodic public reports with the SEC;

(b)     ServiceMaster regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, stock analysts, and other similar reporting services;

(c)     ServiceMaster was followed by several stock analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     ServiceMaster common stock was actively traded in an efficient market, namely the NYSE, under the ticker symbol "SERV."

83.     As a result of the foregoing, the market for ServiceMaster common stock promptly digested current information regarding ServiceMaster from all publicly available sources and reflected such information in ServiceMaster's stock price.  Under these circumstances, all purchasers of ServiceMaster common stock during the Class Period suffered similar injury through their purchase of ServiceMaster's common stock at artificially inflated prices and the presumption of reliance applies.

84.     Further, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a

presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S.

128, 153 (1972).

## NO SAFE HARBOR

85.     The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions.  In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements"

when made and there were no meaningful cautionary statements identifying important factors

that could cause actual results to differ materially from those in the purportedly forward-looking

statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply

to any forward-looking statements pleaded herein, Defendants are liable for those false forward-

looking statements because at the time each of those forward-looking statements were made, the

speaker had actual knowledge that the forward-looking statement was materially false or

misleading, and/or the forward-looking statement was authorized or approved by an executive

officer of ServiceMaster who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

86.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of  all persons or entities who purchased or otherwise

acquired ServiceMaster common stock during the Class Period (the "Class").  Excluded from

the Class are: Defendants; the Excluded D&Os; members of Defendants' and the Excluded

D&Os' immediate families; the subsidiaries and affiliates of the Company, including the

Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to

the extent they made purchases through such plan(s); any entity in which Defendants or the

Excluded D&Os have or had a controlling interest; and the legal representatives, heirs, successors or assigns of any excluded person or entity.

87.      There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)      Whether the Exchange Act was violated by Defendants;

(b)      Whether Defendants omitted and/or misrepresented material facts;

(c)      Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)      Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)      Whether the price of ServiceMaster common stock was artificially inflated; and

(f)      The extent of the damage sustained by Class members and the appropriate measure of damages.

88.      Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

89.      Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation.  Plaintiff has no interests that conflict with those of the Class.

90.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT  I

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

91.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

92.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

93.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

        (a)     Employed devices, schemes, and artifices to defraud;

        (b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of ServiceMaster common stock during the Class Period.

94.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ServiceMaster common stock.  Plaintiff and the Class would not have purchased ServiceMaster common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

95.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of ServiceMaster common stock during the Class Period.

## COUNT  II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

96.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

97.     The Individual Defendants acted as controlling persons of ServiceMaster within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about ServiceMaster, the Individual Defendants had the power and ability to control the actions of ServiceMaster and its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the

Court.

**<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury.

DATED:  April 10, 2020                                    Respectfully submitted,

                                                         **LABATON SUCHAROW LLP**

                                                         <u>/s/ *Francis P. McConville*   </u>
                                                         Christopher J. Keller
                                                         Eric J. Belfi
                                                         Francis P. McConville
                                                         140 Broadway
                                                         New York, New York 10005
                                                         Telephone: (212) 907-0700
                                                         Facsimile: (212) 818-0477
                                                         ckeller@labaton.com
                                                         ebelfi@labaton.com
                                                         fmcconville@labaton.com

                                                         *Counsel for Plaintiff*

## CERTIFICATION

I, Michael Ruttenberg, hereby certify as follows:

1.      I have reviewed a complaint prepared against ServiceMaster Global Holdings Inc.. ("ServiceMaster") alleging violations of the federal securities laws, and authorize the filing of this pleading;

2.      I did not transact in the securities of ServiceMaster at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      I am willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  I fully understand the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      My transactions in ServiceMaster securities are reflected in Exhibit A attached hereto;

5.      I have not sought to serve as a lead plaintiff in any class action filed under the federal securities laws during the last three years;

6.      Beyond my pro rata share of any recovery, I will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 10th day of April, 2020.

DocuSigned by:

327BC21919184AE...

Michael Ruttenberg

## EXHIBIT A

## TRANSACTIONS IN SERVICEMATER GLOBAL HOLDINGS INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 10/22/2019 | 100 | $50.00 | ($5,000.00) |